**COUNTY OF LEBANON, Petitioner**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent**

Commonwealth Court of Pennsylvania.

Argued April 5, 2005.

Decided May 6, 2005.

R. Scot Feeman, Lebanon, for petitioner.

Joel S. Barras, Harrisburg, for respondent.

Thomas H. Kohn, Philadelphia, for intervenor, International Assoc. of Firefighters Local 3969.

BEFORE: SMITH–RIBNER, J., and PELLEGRINI, J., and KELLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

The County of Lebanon (County) appeals an order of the Pennsylvania Labor Relations Board (Board) reversing the decision of a Hearing Examiner that dismissed a Petition for Representation filed by the International Association of Firefighters, Local 3969 (Union) on behalf of several employees comprising the County's Hazardous Materials Team (Hazmat Team) to represent them as "firefighters" under what is commonly referred to as Act 111.[1]

## I.

The County is a county of the fifth class and a political subdivision of the Commonwealth of Pennsylvania. Its Emergency Management Agency (EMA) has a certified Hazmat Team consisting of EMA employees John Wilson, Christopher Miller, and Matthew Clements, who hold the positions of control room supervisor, training officer, and planning officer respectively.

On September 13, 2002, the Union filed a Petition for Representation with the Board seeking authority to represent Wilson, Miller, and Clements as "firefighters" under Act 111.[2] At the initial hearing before the Hearing Examiner, evidence indicated that Wilson, Miller, and Clements generally performed administrative work or emergency response work as part of the Hazmat team. They were certified hazardous material responders who responded to hazardous material calls within the County. Although they did not respond to fires specifically, they did respond to fire scenes in the County where there were existing or potential problems with hazardous materials.

From January 1, 2002, through November 4, 2002, the Hazmat Team responded to 71 incidents, none of which involved requests for firefighters; instead, the Hazmat Team was called to respond to problems or potential problems with hazardous materials. In only three of the 71 inci-

---

1. Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§ 217.1–217.12.

2. The Petition indicates that Wilson is the President of Local 3969 and Miller is the Secretary/Treasurer.

dents did the Hazmat Team assist local fire companies in firefighting activities.[3] In the preceding year (2001), the Hazmat Team responded to 146 incidents, only one of which required the Hazmat Team to perform firefighting activities.[4]

After the close of the proceedings, the Hearing Examiner issued a proposed decision dismissing the Petition for Representation, reasoning that the employees had no legislative authority to act as firefighters. The Union filed exceptions to the proposed decision of the Hearing Examiner.

On appeal, the Board made additional findings of fact. It found that Wilson, Miller, and Clements were all required to follow the National Fire Protection Association's "Recommended Practice for Responding to Hazardous Materials Incidents" (NFPA 471) and its "Standard for Professional Competence of Responders to Hazardous Materials Incidents" (NFPA 472), noting that Wilson, Miller, and Clements all received training and certifications required by the Federal Emergency Management Agency (FEMA) and the Pennsylvania Emergency Management Agency (PEMA). The Board also found that the Hazmat Team used a truck known as a "fire pumper" when responding to certain incidents, which is a truck equipped to carry 185 gallons of foam used in chemical and flammable liquids firefighting. The Board also noted that the Hazmat Team used fire extinguishers with special firefighting agents for suppressing metal fires and foam extinguishers for suppressing vinyl liquid fires.

The Board also found that PEMA's "Emergency Management Guidance and Information Circular No. C93–1" provided guidance for appropriate emergency response to spills or leaks from vehicle fuel tanks or heating system fuel supply tanks and stated that Hazmat Teams were to be called to an incident where there was a potentially dangerous or significant uncontained fire. Finally, the Board found that PEMA's "Emergency Management Directive No. D2001–3" enumerated a nonexhaustive list of incidents involving fires at which the Hazmat Team was expected to respond.

Based on its findings, the Board reversed the proposed decision and order of the Hearing Examiner, concluding that Wilson, Miller, and Clements were "firefighters" within the meaning of Act 111. It reasoned that the employees had the legislative authority to act as firefighters under the Hazardous Material Emergency Planning and Response Act (Hazmat Act)[5] and that they did, in fact, exercise that authority, however infrequent that exercise might have been. After the County's exceptions were denied by the Board, the order became final, and this appeal followed.[6]

---

3. The three incidents in 2002 that involved fires were as follows: (1) a diesel fuel spill at the scene of a barn fire; (2) fuel spills as a result of a major structure fire; and (3) pesticide releases resulting from a dumpster fire requiring the Hazmat Team to extinguish the fire and decontaminate firefighters and their equipment.

4. The one incident in 2001 that involved a fire required the Hazmat Team to respond to the potential explosion of an oil tank near the rear of a major structure that caught on fire.

5. Act of December 7, 1990, P.L. 639, *as amended*, 35 P.S. §§ 6022.101–6022.307.

6. Our scope of review is limited to determining whether there was a violation of constitutional rights, whether an error of law was committed, or whether the Board's necessary findings are supported by substantial evidence. *Upper St. Clair Police Officers Association v. Pennsylvania Labor Relations Board*, 689 A.2d 362 (Pa.Cmwlth.), *petition for allowance of appeal denied*, 549 Pa. 721, 701 A.2d 580 (1997).

## II.

The issue in this case is whether Hazmat employees are "firefighters" for purposes of Act 111's collective bargaining provisions. The history and purpose of Act 111 was set forth by our Supreme Court in *Pennsylvania State Police v. Pennsylvania State Troopers' Association,* 540 Pa. 66, 656 A.2d 83 (1995) (hereafter *Betancourt*).

As explained in *Betancourt,* neither police officers nor firefighters had the right to collectively bargain with their public employers, and neither group had the right to strike before Act 111. Although legislation in place at the time allowed for limited negotiated settlements of grievances, (which purported to balance the employment interests of police officers and firefighters with the public safety interest of preventing these employees from engaging in strikes), that legislation was struck down as an unconstitutional delegation of legislative power "insofar as it allowed arbitrators to compel municipalities to enact legislation." *Id.* at 77, 656 A.2d at 89, n. 14 (citing *Erie Firefighters v. Gardner,* 406

Pa. 395, 178 A.2d 691 (1962)). Into the 1960s, labor relations in the public sector deteriorated and purportedly led to "illegal strikes and a general breakdown in communication between public employers and their employees[.]" *Id.*

Because it was unconstitutional to allow interest arbitration—arbitration that set the terms and conditions of employment, the Pennsylvania Constitution was amended in 1967 to authorize the General Assembly to pass laws governing collective bargaining by "policemen and firemen" with their public employers. *See* PA. CONST. art. 3, § 31.[7] Act 111 was then enacted and allowed collective bargaining by police and fire personnel with their respective public employers regarding the "terms and conditions of employment," but giving police and fire personnel, as opposed to other classes of public employees covered by the Public Employe Relations Act,[8] the right to interest arbitration.

■ Act 111, as read *in pari materia* with the Pennsylvania Labor Relations Act (PLRA),[9] does not define "policemen or firemen." Our courts, however, have de-

---

7. That section provides as follows:

The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever. *Notwithstanding the foregoing limitation or any other provision of the Constitution, the General Assembly may enact laws which provide that the findings of panels or commissions, selected and acting in accordance with law for the adjustment or settlement of grievances or disputes or for collective bargaining between policemen and firemen and their public employers shall be binding upon all parties* and shall constitute a mandate to the head of the political subdivision which is the employer, or to the appropriate officer of the Commonwealth if the Commonwealth is the employer, with

respect to matters which can be remedied by administrative action, and to the lawmaking body of such political subdivision or of the Commonwealth, with respect to matters which require legislative action, to take the action necessary to carry out such findings.

PA. CONST. art. 3, § 31 (emphasis added).

8. Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.101–1101.2301.

9. Act of June 1, 1937, P.L. 1168, *as amended,* 43 P.S. §§ 211.1–211.13. Act 111 did not provide for any of the other typical features contained in collective bargaining statutes; for example, there are no provisions for unfair labor practices. Our Supreme Court in *Philadelphia Fire Officers Association v. Pennsylvania Labor Relations Board,* 470 Pa. 550, 369 A.2d 259 (1977), held that Act 111 and the PLRA, when not in conflict, are to be read in *pari materia.*

veloped a conjunctive, two-part inquiry to decide whether employees are police officers or fire personnel: (1) whether the employees are legislatively authorized to act as police officers or fire personnel; and (2) whether the employees, in effect, act as police officers or fire personnel. *Narcotics Agents Regional Committee v. Pennsylvania Labor Relations Board*, 833 A.2d 314 (Pa.Cmwlth.2003), *petition for allowance of appeal denied*, 577 Pa. 729, 847 A.2d 1290 (2004).

While most of our cases deal with police personnel,[10] those cases are still instructive when analyzing the first prong of the test, i.e., whether there is an explicit grant of legislative power to act as either police officers or fire fighters. In *Venneri v. Allegheny County*, 12 Pa.Cmwlth. 517, 316 A.2d 120 (1974), for example, sheriffs and deputy sheriffs were denied bargaining rights under Act 111 because there was no legislation indicating that sheriffs were anything but court personnel, as opposed to police officers who were granted general police powers. Consequently, sheriffs and their deputies were not "policemen" within the meaning of Act 111. *See also Cambria County Deputy Sheriffs Association v. Pennsylvania Labor Relations Board*, 799 A.2d 957 (Pa.Cmwlth.2002) (recognition of common law arrest powers of sheriff insufficient to find legislative authorization to act as police officers).

Similarly, park police were denied the right to bargain under Act 111 because those employees were not considered police officers. *Delaware County Lodge No. 27, Fraternal Order of Police v. Pennsylvania Labor Relations Board*, 690 A.2d 754 (Pa.Cmwlth.1997), *petition for allowance of appeal denied*, 548 Pa. 674, 698 A.2d 597 (1997). In that case, the Fraternal Order of Police argued that the Second Class County Code[11] authorized park police to act as police officers. We held that while Sections 3033 and 3034 of that Code authorized the park police to enforce the rules and regulations established by the county commissioners as related to parks, there was no specific statutory authorization for the park police to enforce all the laws of the Commonwealth.

■ Even where some police power is authorized by the General Assembly, a limitation on those powers tends to suggest that employees cannot bargain as police officers under Act 111. For instance, in *Fraternal Order of Police v. Pennsylvania Labor Relations Board*, 71 Pa.Cmwlth. 316, 454 A.2d 686 (1983), *aff'd per curiam*, 502 Pa. 541, 467 A.2d 323 (1983) (*Liquor Control*), we held that liquor control enforcement officers were only empowered to enforce the limited area of liquor laws, and that their powers and duties did not extend to enforcement of all the laws of the Commonwealth. *See also Narcotics Agents* (agents were not police officers for purposes of Act 111 because they pos-

---

10. The Board has decided at least two cases involving firefighters. *See City of Arnold*, 20 Pa. Pub. Emp. R ¶ 20124 (Final Order 1989); *City of New Kensington*, 18 Pa. Pub. Emp. R ¶ 18023 (Final Order 1986). Both cases involved employees of fire bureaus established under the Third Class City Code, Act of June 21, 1931, P.L. 932, as amended, 53 P.S. §§ 35101–39701. That Code authorized each city to organize a fire bureau, to appropriate for its maintenance, to establish rules and regulations for governance of the fire bureau, and to purchase equipment for the extinguishment, prevention, and investigation of fires for the public safety, legislatively authorized the employees in those cases to bargain under Act 111. Because the employees were legislatively authorized to act as firefighters and they in fact acted as firefighters, the Board held that they could bargain under Act 111.

11. Act of July 28, 1953, P.L. 723, *as amended*, 16 P.S. §§ 3101–6302.

sessed only limited law enforcement powers).

However, where employees are given broad, as opposed to limited, powers to act as police or fire personnel, our courts have found that employees were legislatively authorized to act as such for purposes of Act 111. In *Commonwealth v. Pennsylvania Labor Relations Board*, 502 Pa. 7, 463 A.2d 409 (1983) (*Capitol Police*), Capitol Police officers from Scranton sought Act 111 bargaining status. Section 2416 of the Administrative Code of 1929 (Administrative Code)[12] gave the Capitol Police the authorization "[t]o exercise the same powers as are now or may hereafter be exercised under authority of law or ordinance by the police of the cities of Harrisburg, Pittsburgh and Philadelphia, municipalities in Dauphin County wherein State buildings are located and in municipalities wherein said colleges, universities and community colleges are located[.]" Reversing our decision that Capitol Police in Scranton had limited authority to act as police officers, our Supreme Court stated as follows:

> In the event of need, [the Capitol Police] possess the ability, capacity and authority to interpose in any situation requiring police intervention. Capitol Police are required "and their duty shall be" to enforce order on state property, to arrest persons in breach of the law, and "to carry the offender before the proper alderman, justice of the peace or magistrate and prefer charges against him under the laws of the Commonwealth." 71 P.S. § 646. The performance of these duties *is statutorily mandated and is not merely incidental to the responsibilities of the Capitol Police. Cf. Venneri v. County of Allegheny*, 12 Pa. Cmwlth. 517, 316 A.2d 120 (1974).

*Capitol Police*, 502 Pa. at 13–14, 463 A.2d at 412–413 (footnote omitted; emphasis

added). *See also Allegheny County v. Hartshorn*, 9 Pa.Cmwlth. 132, 304 A.2d 716 (1973), *affirmed*, 460 Pa. 560, 333 A.2d 914 (1975) (detectives in Allegheny County were police officers for purposes of Act 111 because Section 1440 of the Second Class County Code, 16 P.S. § 4440, stated that "detectives shall be general police officers"); *Commonwealth v. Pennsylvania Labor Relations Board*, 125 Pa.Cmwlth. 549, 558 A.2d 581 (1989) (*Park Rangers*) (park rangers were police officers for purposes of Act 111 because section 1906–A of the Administrative Code, 71 P.S. § 510–6(7)(a)–(d), gave park rangers the authorization "to have all the powers and prerogatives conferred by law upon members of the police force of the cities of the first class"); *cf. American Federation of State, County, and Municipal Employees Council 13, AFL–CIO by Keller v. Pennsylvania Labor Relations Board*, 140 Pa. Cmwlth. 352, 593 A.2d 4 (1991) (although Section 902 of the Fish and Boat Code, 30 Pa.C.S. § 902, authorized Wildlife Conservation Officers (WCOs) to enforce all other laws of the Commonwealth as well as rules and regulations relating to game, parks and forestry, Section 304(b) specifically excluded WCOs from bargaining under Act 111).

### III.

With these cases in mind, we turn to an analysis of whether the Hazmat employees are firefighters. The County argues that there is no legislative authorization empowering Hazmat employees to act as firefighters because the County has never employed its Hazmat team as a firefighting force, and the team only responds to hazardous material incidents, not fire calls. The County also argues that the Hazmat employees do not act effectively as firefighters because when they respond to a call, they deal with only the hazardous

**12.** Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 646.

materials and direct the control or abatement of the hazardous material at the scene—any help they give to firefighters is only incidental to this role. In response, the Board argues that the Hazmat Act authorizes Hazmat employees to act as firefighters, and the record supports the conclusion that these particular employees have engaged in firefighting duties as necessary no matter how infrequently they provide such services.

The Board places a great deal of emphasis on provisions within the Hazmat Act that refer to federal standards for training and certification of hazmat employees to contend that the Hazmat Act provides legislative authorization for hazmat teams to act as firefighters. In passing the Hazmat Act, the General Assembly indicated in its findings that release of hazardous materials has the "potential for causing undesirable health and environmental effects and poses a threat to the health, safety, and welfare of the citizens of the Commonwealth and emergency service personnel who respond to emergency situations[.]" Section 102(a) of the Hazmat Act, 35 P.S. § 6022.102(a). It was, therefore, necessary to quell any harmful exposures resulting from the release of hazardous materials. The purpose of the Hazmat Act as indicated in Section 102(b), consequently, is (1) to establish the Pennsylvania Emergency Management Council; (2) to establish emergency planning districts and local emergency planning committees in each county of the Commonwealth; (3) to establish hazardous material safety programs; (4) to create the Hazardous Material Response Fund to assist localities in developing the capability to respond to hazardous material incidents; (5) to establish an emergency notification system; (6) to assign responsibilities to state and local agencies to ensure the development of hazardous material safety programs; (7) to shield emergency responders from liability; and (8) to place liability on persons responsible for the release of hazardous materials to pay for the costs of responding to hazardous material incidents. Section 102(b) of the Hazmat Act, 35 P.S. § 6022.102(b).

Section 103 of Hazmat Act enables counties, each of which is designated as an emergency planning district, to create a hazmat team, which is defined as follows:

A team of individuals who are certified and organized by a Commonwealth agency, a local agency, a regional hazardous material organization, a transporter, a manufacturer, supplier or user of hazardous materials, or a volunteer service organization, or a private contractor, *for the primary purpose of providing emergency response services to mitigate actual or potential immediate threats to public health and the environment in response to the release or threat of a release of a hazardous material, which is certified, trained and equipped in accordance with this act.* Hazardous material response teams may also be certified to perform stabilization actions needed to remove threats to public health and the environment from hazardous material releases.

35 P.S. § 6022.103 (emphasis added). "Hazardous material" is defined generally as (1) a hazardous substance; (2) an extremely hazardous substance; (3) a hazardous chemical; or (4) a toxic chemical. *Id.*[13]

Hazmat employees must be certified according to certain standards. Standards for certifying Hazmat teams include those patterned after levels established by the United States Occupational Safety Health Ad-

---

13. Each type of hazardous material is defined in the Hazmat Act by adopting definitions contained in 29 C.F.R. § 1910.1200(c) and Section 102 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9602.

ministration (OSHA) at 29 C.F.R. § 1910.120. OSHA, in turn, uses the training criteria developed by NFPA 471 and NFPA 472. Under both NFPA 471 and NFPA 472, an "incident" is defined as "[a]n emergency involving the release or potential release of a hazardous material, *with or without a fire.*" *See* NFPA 472, § 3.3.37 (Respondent's Brief App. A) (Emphasis added). NFPA 471 requires that hazmat employees wear personal protective equipment such as "fire entry suits." *See* NFPA 471, § 3.3.13 (Respondent's Brief App. A). It also references the potential for "fire or explosion" as one factor to consider when determining the level of danger a given incident poses. NFPA 471, Table 5.1 (Respondent's Brief App. A). Finally, NFPA 471 defines emergencies as "[a] fire, explosion, or hazardous condition that poses an immediate threat to the safety of life or damage to property." NFPA 471, § 3.3.13 (Respondent's Brief App. A).

Contrary to the Board's contentions, the Hazmat Act is not a blanket authorization to fight fires. Instead, and fundamentally, the Hazmat Act authorizes counties to employ hazmat teams to resolve hazardous material incidents. The Hazmat Act recognizes that those incidents also may involve a fire. However, nothing in the Hazmat Act authorizes hazmat teams to be firefighters; all the Hazmat Act does is enable counties to create hazmat teams to respond to hazardous material incidents and to assure that those employees have the wherewithal to encounter a variety of situations incidental to a hazardous material incident. The mere reference in the training standards to situations where any given hazmat team may encounter a fire and should have training to deal with those situations is insufficient to legislatively authorize hazmat employees to be firefighters.

Moreover, the Board's rationale is not in accord with case law. Unlike the statutes involved in *Capitol Police, Keller, Allegheny County,* and *Park Rangers* authorizing the employees in those cases to execute the general laws of the Commonwealth, the Hazmat Act does not authorize counties to establish hazmat teams for the purpose of fighting fires and with the general authority to act as firefighters.[14] The Hazmat Team here has limited statutory authority, if any at all, to act generally as firefighters because their primary purpose is to suppress the release or threatened release of hazardous materials, to monitor and contain such releases, and to perform cleanup and stabilization actions related to the release of hazardous materials. *See Venerri; Narcotics Agents; Delaware County; Liquor Control.*

In light of the foregoing, because the employees of the Hazmat Team are not legislatively authorized to act as firefighters, the order of the Board is reversed.[15]

### *ORDER*

AND NOW, this *6th* day of *May*, 2005, the order of the Board in the above-captioned matter is reversed.

---

**14.** Indeed, the County in this case, as a county of the fifth class, lacks the authority to even create a fire department. *See generally* Act of August 9, 1955, P.L. 323, *as amended,* 16 P.S. §§ 101–3000.3903 (County Code, as applicable to counties of the fifth class).

**15.** Because there is no legislative authority for Hazmat employees to act as firefighters, we need not reach question of whether they actually act as firefighters. We note, however, that only 2% of all calls (4 of 271) that the employees responded to involved firefighting, and we question whether that would be sufficient to satisfy the second prong of the test for firefighter status under Act 111.